## UNITED STATES DISTRICT COURT FOR
## THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| YOUNG SOOK PAK AND IN SUK PAK<br>t/d/b/a PAK'S FOOD MARKET AND<br>BIG MOUNT LAUNDROMAT AND<br>JOE'S GROCERY STORE | : | No. 08-cv-0824 |
| | : | |
| Plaintiffs | : | |
| | : | Judge Rambo |
| and | : | |
| | : | |
| ALEA LONDON LIMITED AND SIRIUS | : | JURY TRIAL |
| INTERNATIONAL INSURANCE CORP. | : | DEMANDED |
| | : | |
| Defendants. | : | |

## PLAINTIFFS' BRIEF IN OPPOSITION
## TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Steven E. Grubb, Esquire (I.D. #75897)
Goldberg Katzman, P.C.
320 Market Street, P.O. Box 1268
Harrisburg, PA 17108-1268
Telephone: (717) 234-4161
*Attorneys for Plaintiffs*

Date:  March 30, 2009

## TABLE OF CONTENTS

**TABLE OF AUTHORITIES** ............................................................. iii

I.   **COUNTER-STATEMENT OF FACTS** ...................................... 1

II.  **COUNTER-STATEMENT OF QUESTIONS INVOLVED** .................... 6

    A.    **DOES THE RECORD CONTAIN ADEQUATE
EVIDENCE TO PRESENT THE ISSUE OF BAD FAITH
TO THE FINDER OF FACT?** ........................................... 6

    B.    **DOES THE RECORD CONTAIN EVIDENCE TO
SUPPORT PLAINTIFFS' CLAIM THAT DEFENDANTS
VIOLATED THEIR COVERAGE RESPONSIBILITIES
AS TO THE WALL COLLAPSE AT THE PAKS
PROPERTY?** ........................................................... 6

III. **ARGUMENT** ............................................................ 6

    A.    **Material Issues of Fact Exist as to Whether Defendants
Acted in Bad Faith Under 42 Pa. C.S. §8371** ................................. 7

        1.    Defendants Conducted an Investigation Without
Consideration of the Coverages Purchased by the Paks. ........... 9

            a.    **No Meaningful Investigation of what was Visible
to the Paks Occurred.** ................................. 10

            b.    **No Meaningful Investigation Ensued after the
Paks Requested Reconsideration.** .............................. 11

        2.    Had a Meaningful Investigation Regarding Decay Been
Conducted at the Inception of the Claim, the Record
Indicates Decay was not Visible to the Paks. .......................... 12

        3.    Defendants Made no Effort to Conduct Meaningful
Communications with their Insureds. ...................................... 18

        4.    Defendants Blindly Relied on a Single Expert Witness. ......... 18

        5.    Defendants Relied Upon (and Continue to Rely Upon)
Inapplicable Exclusions. ....................................................... 20

**B.**     **The Record Contains Evidence To Support Plaintiffs' Claim That Defendants Violated Their Coverage Responsibilities As To The Wall Collapse At The Paks.** .............. 23

**IV.**   **CONCLUSION** ........................................................................... 24

# TABLE OF AUTHORITIES

## Cases

Barry v. Ohio Cas. Group, 2007 WL 128878, *13 (W.D. Pa. 2007) ...................... 8

Betz v. Erie Ins. Exchange, 957 A.2d 1244 (Pa. Super. 2008)............................... 21

Bowersox Truck Sales and Service, Inc. v. Harco Nat. Ins. Co., 209 F.3d 273
   (3d Cir. 2000) ...................................................................................................... 22

Bracciale v. Nationwide Ins. Co., 1993 WL 323594, *9 (E.D. Pa.)........................ 13

Corch Const. Co. v. Assurance Co. of America, 64 Pa. D&C 4th 496
   (Pa. Comm. Pl. 2003)............................................................................... 9, 13, 20

DeWalt v. Ohio Cas. Ins. Co., 513 F. Supp. 2d 287 (E.D. Pa. 2007)...................... 7

Hollock v. Erie Ins. Exchange, 54 Pa. D&C 4th 449 (Pa. Comm. Pl. 2002),
   affirmed 842 A.2d 409 (Pa. Super. 2004),
   appeal dismissed 588 Pa. 231, 903 A.2d 1185 (2006).......................... 18, 19, 20

Klinger v. State Farm Mut. Auto. Ins. Co., 115 F.3d 230 (3d Cir. 1997) ........... 7, 8

Nguyen v. Healthguard of Lancaster, Inc., 282 F.Supp. 2d 296 (E.D. Pa. 2003) .... 8

Puritan Ins. Co. v. Canadian Universal Ins. Co. Ltd., 775 F.2d 76 (3d Cir. 1985) 13

Rock-Epstein v. Allstate Ins. Co., 2008 WL 4425059, *2 (E.D. Pa.) .................... 23

Romano v. Nationwide Mut. Fire Ins. Co., 435 Pa. Super. 545, 646 A.2d 1228
   (Pa. Super. 1994).................................................................................................. 8

S.R.P. Management Corp. v. Seneca Ins. Co., 2008 WL 2039466, *8 (E.D. Pa.) . 13

Simmons v. Allstate Ins. Co., 1997 WL 214848 (E.D. Pa.),
   judgment amended, 1997 WL 430997 (E.D. Pa.)......................................... 14, 15

Terletsky v. Prudential Property & Cas. Ins. Co., 437 Pa. Super. 108,
   649 A.2d 680 (1994), appeal denied, 540 Pa. 641, 659 A.2d 560 (1995) ......... 7, 8

Williams v. Hartford Ins. Co., 83 F.Supp. 2d 567 (E.D. Pa. 2000),
   affirmed 261 F.3d 495 (3d. Cir. 2001)................................................................. 8

## I.   COUNTER-STATEMENT OF FACTS

Plaintiffs Young Sook Pak and In Suk Pak operate a grocery store known as "Joe's Grocery" at 360 South Queen Street in York, Pennsylvania (Statement of Material Facts of Defendants at ¶4,[1] as admitted by Plaintiffs).  On or about April 8, 2006, after a period of heavy rain, without warning and arising from conditions unknown to the Paks, the north wall of Joe's Grocery collapsed (Def. St. of Facts at ¶10, as admitted; see also, Pl. St. of Facts at ¶¶19, 25, and 26).

After the collapse, the Paks promptly made a claim for coverage with their insurance agent, Joanne Bankos.  Ms. Bankos forwarded the claim to Susan Eich at All Risks, Ltd.  Ms. Eich considered the coverages applicable to the claim and assigned the claim for adjustment to Robert Faith of Johns Eastern Corporation (Pl. St. of Facts at ¶13).

The Paks had a commercial property insurance policy issued by Alea London Limited and Sirius International Insurance Corporation.  They purchased coverage for their building and "building personal property" which included the "stock" or goods at Joe's Grocery.  The policy is considered a high risk policy, or an excess and surplus policy, and, generally, costs more than the standard line insurance (Eich Dep., p. 27, l. 16 – p. 28, l. 17).  As part of their coverage, the Paks

---

[1] Unless otherwise noted, citations to the record for facts, including those in the Argument section, will be through reference to Plaintiffs' Response to Statement of Material Facts (hereinafter "St. of Facts").

purchased coverage for "Collapse," which covered claims where collapse was caused by "decay which was hidden from view" (see Section D of Ex. A to Pl. St. of Facts) (Def. St. of Facts at ¶5, as admitted).

Once Mr. Faith received the claim, he visited the Paks property, took pictures, and noted in his opinion that the wall had collapsed because of settlement/earth movement (Pl. St. of Facts at ¶14). Mr. Faith next consulted Ms. Eich at All Risks, seeking permission to hire an engineer to analyze the cause of the collapse. After receiving approval from Ms. Eich, he hired Kelly Huff of SEA Limited (Pl. St. of Facts at ¶14). Mr. Faith had used Ms. Huff for wall collapse claims before. He testified that he handles about four to six wall collapses a year and recommends denial of most wall collapse claims. As of 2006, Ms. Huff was the only investigator used by Mr. Faith for wall collapse investigations (Pl. St. of Facts at ¶16).

Ms. Huff visited the property and prepared a report where she opined that a lack of maintenance and water intrusion caused deterioration and decay to the wall which caused it to collapse (Pl. St. of Facts at ¶15). Mr. Faith then drafted a denial letter based exclusively on Ms. Huff's report and forwarded it to Ms. Eich (Pl. St. of Facts at ¶16).

No record evidence indicates any effort was made by Mr. Faith or Ms. Huff to speak with the Paks or attempt to take any sort of history of the building (Pl. St.

of Facts at ¶¶15, 16).  Had they asked, the Paks would have been able to present a

strong maintenance history which included a complete roof replacement at the

building which included the replacement of rotted wood in the 2001/2002 time

period.  Ms. Huff and Mr. Faith would have also learned that there had been no

evidence of water intrusion around the wall since mid-2002 and that any other

evidence of minor water intrusion was in other areas of the house.  All told, there

had been no evidence of water intrusion for six months to a year prior to the

collapse.  They would have further learned that the wall was covered with

vegetation which obscured the view of the bricks and mortar; that no one,

including past insurance companies, had identified any issues with the wall; and

that the Paks, as ordinary laypersons, were not qualified to identify signs of decay

(Pl. St. of Facts at ¶¶19, 24).

A meaningful interview of the Paks was also not possible, since the Paks did

not speak fluent English, and no effort at understanding or communicating with the

Paks was made (Pl. St. of Facts at ¶15).

Mr. Faith and Ms. Huff also made no inquiry of any York City records

regarding any notices of problems with the wall (of which there were none) until

after the litigation began; nor did it inquire of any other analyses regarding the

collapse of the wall such as that of Joshua Carney, who had performed a post-

collapse inspection for the City and could not come to a conclusion as to the cause

3

of the collapse. Mr. Faith relied solely on Ms. Huff's report, ignoring all other evidence available to him (Pl. St. of Facts at ¶¶15, 16).

Ms. Eich of All Risks had no authority to deny coverage, nor did she conduct any sort of independent analysis of the claim. She merely forwarded Mr. Faith's denial recommendation to brokers in London, England. The brokers set up an appointment with the Defendants who rendered an "advice" as to the coverage issue. Neither the brokers, nor insurance companies, did any further investigation of the claim and, in fact, the identity of which individual from Defendants that considered this claim is not even known. An "advice" approving denial was given to the broker who conveyed the advice to Ms. Eich who then gave Mr. Faith approval to issue the denial letter (Pl. St. of Facts at ¶17).

Shockingly, the denial letter failed to recognize that the Paks had coverage for incidents of Collapse and based its denial on exclusions pertaining to wear and tear, deterioration and water intrusion. The denial letter literally states that the Paks did not have coverage for Collapse, exhibiting a disregard for the coverages the Paks had in place and which clearly tainted the considerations Mr. Faith, and Ms. Huff, made in determining coverage. Clearly, the issue of hidden decay and what was visible to the Paks was not considered (Pl. St. of Facts at ¶16).

The Paks retained counsel who questioned the denial, noting that Collapse coverage was in place and that even Ms. Huff's report attributed the collapse to deterioration and decay which only became visible after the wall came down (Pl. St. of Facts at ¶18, Pl. St. of Facts, Ex. I).

The request for reconsideration was forwarded to Ms. Eich who forwarded it to the brokers who apparently sat with still unidentified employees of Defendants. This time, the broker handling the request for reconsideration did raise the issue of whether the adjuster and engineer were confident that the Paks had been able to see the deterioration which caused the collapse. In response to this inquiry, Mr. Faith asked Ms. Huff whether what she noted as the cause of the collapse would have been visible to the Paks, or anyone else, to which she speculated, without asking the Paks, that it would have been visible (Pl. St. of Facts at ¶18). Based on this, and without any further investigation, Defendants re-confirmed their denial of the Paks' claim on January 18, 2007. The January 18 letter still failed to recognize that the Paks had coverage for Collapse (Pl. St. of Facts at ¶18).

The Paks pursue claims for breach of contract and bad faith based on this denial.

## II.   COUNTER-STATEMENT[2] OF QUESTIONS INVOLVED

### A.   DOES THE RECORD CONTAIN ADEQUATE EVIDENCE TO PRESENT THE ISSUE OF BAD FAITH TO THE FINDER OF FACT?

Suggested Answer: **Yes.**

### B.   DOES THE RECORD CONTAIN EVIDENCE TO SUPPORT PLAINTIFFS' CLAIM THAT DEFENDANTS VIOLATED THEIR COVERAGE RESPONSIBILITIES AS TO THE WALL COLLAPSE AT THE PAKS PROPERTY?

Suggested Answer: **Yes.**

## III.   ARGUMENT

Federal Rule of Civil Procedure 56 governs motions for summary judgment.

Section (c) of the Rule states:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

When deciding a motion for summary judgment, a court must draw all reasonable inferences in the light most favorable to the nonmoving party.  Brown v. Liberty Mutual Fire Ins., 2008 WL 819897, *3 (E.D. Pa. 2008).

---

[2]Defendants' Brief and Motion fail to comply with Local Rules of Court in several respects.  Initially, contrary to Local Rule 7.8, there is no Statement of Questions Presented.  Additionally, the size of the typeface violates Rule 5.1(c) and, contrary to Local Rule 7.1, the Motion fails to certify that concurrence was sought in the motion.

### A.    Material Issues of Fact Exist as to Whether Defendants Acted in Bad Faith Under 42 Pa. C.S. §8371

Defendants first seek dismissal of Count II of Plaintiffs' Complaint alleging

Insurance Bad Faith under 42 Pa. C.S. §8371.  Pennsylvania's Bad Faith statute

does not define bad faith but courts follow a two-prong analysis stated in Terletsky

v. Prudential Property & Cas. Ins. Co., 437 Pa. Super. 108, 125, 649 A.2d 680,

689-90 (1994), appeal denied, 540 Pa. 641, 659 A.2d 560 (1995); DeWalt v. Ohio

Cas. Ins. Co., 513 F. Supp. 2d 287, 294 (E.D. Pa. 2007).  A plaintiff must establish

by clear and convincing evidence that (1) the insurer lacked a reasonable basis for

denying coverage; and (2) that the insurer knew or recklessly disregarded its lack

of a reasonable basis.  Id.  See also Klinger v. State Farm Mut. Auto. Ins. Co., 115

F.3d 230, 233 (3d Cir. 1997).

Terletsky relied on the definition of "Bad Faith" in Blacks Law Dictionary:

> Insurance. "Bad faith" on part of insurer is any frivolous or
> unfounded refusal to pay proceeds of a policy; it is not
> necessary that such refusal be fraudulent. For purposes of an
> action against an insurer for failure to pay a claim, such conduct
> imports a dishonest purpose and means a breach of a known
> duty ( i.e., good faith and fair dealing), through some motive of
> self-interest or ill will; mere negligence or bad judgment is not
> bad faith.

Id. at 125, 649 A.2d at 688.  Klinger rejected, as dicta, the latter part of the Black's

definition regarding proof of an improper purpose, such as ill will or self interest,

particularly where this part of the definition was not applied in Terletsky. Id. at 233-34. Despite the raised burden placed on a plaintiff, even in a bad faith situation, "at the summary judgment stage, the Court's function is not to weigh the evidence and determine the truth of the matter, but rather to determine whether there is a genuine issue of material fact for trial." Barry v. Ohio Cas. Group, 2007 WL 128878, *13 (W.D. Pa. 2007).

Insurers also owe a duty of 'utmost good faith' towards its insured, particularly in first-party claims of coverage, recognizing that "the insurer handles claims and controls settlement." Nguyen v. Healthguard of Lancaster, Inc., 282 F.Supp. 2d 296, 302 (E.D. Pa. 2003) *citing* Romano v. Nationwide Mut. Fire Ins. Co., 435 Pa. Super. 545, 550-551, 646 A.2d 1228, 1231 (Pa. Super. 1994). Id. An insurer must act in good faith toward its insured, according the same faithful consideration it gives its own interests. Williams v. Hartford Ins. Co., 83 F.Supp. 2d 567 (E.D. Pa. 2000), affirmed 261 F.3d 495 (3d. Cir. 2001).

Thus, where Plaintiffs have a heightened standard, the law also demands a high standard of diligence and a fair handling of the claim by the insurer. The facts of record show an unreasonable denial of the Paks' claim, and a reckless disregard for the lack of a reasonable basis.

8

1.    Defendants Conducted an Investigation Without
      Consideration of the Coverages Purchased by the Paks.

Bad faith exists where an insurer engages in an unreasonable interpretation

of the policy provisions or blatantly misrepresents the facts or policy provisions.

Corch Const. Co. v. Assurance Co. of America, 64 Pa. D&C 4th 496, 516-17 (Pa.

Comm. Pl. 2003).

The entire investigation conducted by Defendants was tainted by the fact

that at the inception of this claim, Defendants blatantly ignored coverages

applicable to the Paks.  It is not disputed that the Paks purchased coverage for

"Collapse."  Section D of the Causes of Loss – Special Form (Pl. St. of Facts, Ex.

A) covers "Collapse" and specifically states that Defendants will pay where

collapse is caused by "Decay that is hidden from view, unless the presence of such

decay is known to an insured prior to collapse."

Mr. Faith, however, in his May 2006 denial letter, approved by Defendants

via Ms. Eich and London brokers (Pl. St. of Facts at ¶¶16, 17) stated, "Collapse is

not a named peril, which is not covered under the CP 1030 (4/02) named peril

policy."  Instead, Mr. Faith's denial is based on exclusions B.2.d. and f. pertaining

to "wear and tear," deterioration and corrosion and water penetration.

### a.   No Meaningful Investigation of what was Visible to the Paks Occurred.

Defendants' unexplained failure to consider Collapse coverage, in and of itself is an indication of bad faith, as described above. But it also had ramifications to the investigation of the claim. Based on the clear language of the Collapse coverage, the most important inquiry in this case is whether the decay or deterioration found by Ms. Huff was "known to an insured prior to collapse."

Yet neither Mr. Faith nor Ms. Huff made this obvious and highly critical inquiry of the Paks (Pl. St. of Facts at ¶¶15, 16). Mr. Faith acknowledged that asking the insured what happened is typically the first area of inquiry he engages in, but the Paks did not recollect speaking on the topic with him, nor did he recollect raising the topic with them (Pl. St. of Facts at ¶16). Ms. Huff did not speak to the Paks about what was visible to them prior to the collapse either (Pl. St. of Facts at ¶15). The Paks do reference speaking to a lady from the insurance company, but the extent of that conversation was the Paks asking her the cause of the collapse and her responding that she did not know, but it might have been the rain (Pl. St. of Facts at ¶15). Ms. Huff's initial report did not investigate or opine as to what was visible to the Paks and is reflective of Mr. Faith not knowing what to investigate because he did not know which coverages were in place (Ex. B of Ex. B to Defendants' Motion). Where no one investigated the visibility issue, because the

issue was not known to Mr. Faith or Ms. Huff, Defendants cannot credibly say they did a proper investigation prior to denial of the Paks' claim.

### b. No Meaningful Investigation Ensued after the Paks Requested Reconsideration

After the original denial, the Paks requested reconsideration of the denial through counsel, Attorney Glenn Smith (Pl. St. of Facts, Ex. I). In the request for reconsideration, Mr. Smith raised the Collapse coverage and pointed out that the decay had to be visible to the Paks for coverage to be denied.

This would have been the first instance where the coverage for Collapse was considered by Mr. Faith (since he specifically stated that it was <u>not</u> covered previously). Attorney Smith's letter raised concerns by Defendants, expressed through their brokers. On January 9th, one Michael Bernard (a broker) stated:

> Please have adjuster comment (as a matter of urgency) as to whether insured's counsel's assertion that the defect was hidden and therefore his client would have been unaware of the latent damage? If the insured would not have been reasonably aware of the damage then it would seem coverage may exist. How confident is adjuster/engineer that the wear and tear was obvious? Pl. St. of Facts, Ex. J.

Rather than consider this newfound coverage and responsibly investigate the decay that "was visible to the insureds" Mr. Faith merely asked Ms. Huff if what she observed would have been visible to the Paks. Ms. Huff speculated that it would have (Pl. St. of Facts at ¶18). Again, no one asked the Paks; no one asked

11

the City of York whether there had been any code violations relative to the building, or if the City had done its own investigation (which it had). Mr. Faith's conversation with Ms. Huff was apparently enough for Defendants who approved the January 18, 2007 denial reconfirmation. All other sources of information were ignored.

The reports Ms. Huff submitted are telling. The initial April 2006 report says nothing regarding what should have been visible to the Paks (see Ex. B of Ex. B to Defendant's Motion). Her February 2009 report (Ex. F of Defendants' Motion), however, based on the same pictures and views of April 2006, adds opinions about what should have been visible. While noting that she reviewed other sources of information, such as the depositions of the Paks, opinions of other engineers, and City of York records, she fails to address the contrary views of what was visible to the Paks.

> 2.   Had a Meaningful Investigation Regarding Decay Been
>       Conducted at the Inception of the Claim, the Record
>       Indicates Decay was not Visible to the Paks.

Pennsylvania courts have held that bad faith exists when an insurance company fails to conduct a meaningful investigation of a claim. Bad faith can exist where an insurer's evaluation is less than honest, intelligent and objective.

12

Bracciale v. Nationwide Ins. Co., 1993 WL 323594, *9 (E.D. Pa.), *citing* Puritan Ins. Co. v. Canadian Universal Ins. Co. Ltd., 775 F.2d 76 (3d Cir. 1985).

Case law analyzing the specific phrase, "decay that is hidden from view" is sparse, but case law exists regarding "hidden decay," including a case directly dealing with cracked mortar between bricks.  None of this case law appears to have been considered by Defendants in the handling of the Paks' claim, or even the brief Defendants now submit.[3]

Where "hidden decay" is not defined under an insurance policy it is given its plain and ordinary meaning.  S.R.P. Management Corp. v. Seneca Ins. Co., 2008 WL 2039466, *8 (E.D. Pa.).  "Hidden decay" has been interpreted to mean decay that is "not visible, out of sight or off the beaten track; concealed."  Id. at 7.  When analyzing what constitutes "hidden decay" courts typically apply an objective test to determine whether a reasonable insured, under the circumstances, would have seen or otherwise been aware of the decay.  Id.  An insured need not affirmatively inspect the premises so as to discover otherwise hidden decay.  Id.

Whether cracks in mortar between bricks is "hidden decay" was addressed in Simmons v. Allstate Ins. Co., 1997 WL 214848 (E.D. Pa.), judgment amended,

---

[3] Failure to perform adequate legal research concerning a coverage issue can constitute bad faith.  Corch Const. Co, 64 Pa. D&C 4th at 516 (Pa. Comm. Pl. 2003) and Bracciale v. Nationwide Mut. Ins. Co., 1993 U.S. Dist. LEXIS 11606, *9 (E.D. Pa.).

1997 WL 430997 (E.D. Pa.).  In <u>Simmons</u>, the Eastern District held that cracks or

decay in mortar joints are considered "hidden," holding that "there is generally no

effective way for a homeowner to determine the existence of decay between the

CMU's" (concrete masonry units, or bricks).  <u>Id.</u> at *2.  Further, the court, in

adopting testimony of an expert witness, held that:

> Ordinarily it would be useless for a homeowner to poke a tool
> into the mortar joint either to try to obtain some of the material
> or simply to observe the tool's response.  Moreover even Finch
> [the insurance company's expert] admitted that an owner often
> may not know of the existence of mortar decay.

<u>Id.</u>

A relevant inquiry in <u>Simmons,</u> a 12-year old case certainly available to

Defendants in analyzing this claim, was the importance of Plaintiff's testimony as

to what he observed.  In particular, Plaintiff was unaware of the reduced strength

of the mortar and testified that the relevant wall was covered by sealer paint, in

support of the holding that the decay was hidden.  <u>Id.</u>  The Court further held that

evidence that the wall had been previously repointed and had a one-inch bulge

after the collapse was not evidence that a reasonable person would know of the

decay.  <u>Id.</u> at *3.

The Eastern District has recognized that even if a reasonable homeowner

observes mortar cracks, this is, generally, not meaningful to him or her and is still

considered "hidden decay."  <u>Simmons</u> rules out any reliance by Defendants on the

visibility of mortar and brick deterioration, which was the most important facet of what Defendants believe the Paks should have seen.

When finally asked, in the course of this litigation, whether the presence of decay/deterioration was known prior to the collapse, the Paks testified that they had observed no decay in the wall from the outside or inside. From the outside, their view was obscured by vegetation, which they considered decorative. Mr. Pak testified that he would have only observe the wall in the summer months, thus the vegetation would have been in full bloom (Pl. St. of Facts at ¶19, 26).

Mr. Pak further testified that he would not have known what to look for in terms of decay of a brick wall (Pl. St. of Facts at ¶19), a position supported by David Aufiero where he questioned whether an ordinary layperson would have been aware of brick and mortar deterioration as signs of decay leading to a collapse (see Ex. D of Defendants' Motion). These observations are in line with Simmons and not even considered by Ms. Huff or Mr. Faith.

As for observations of decay on the interior of the property, the record supports that evidence of decay was, similarly, not visible. The Paks testified that they had observed instances of water penetration several years prior to the collapse which led to a complete roof replacement at the property. This occurred in late

15

2001 and potentially into 2002.[4]  After the replacement, the Paks observed water

intrusion near the collapsed wall approximately six months after completion of the

roof replacement, after corrective actions by the roofing contractor, but at no time

thereafter (Pl. St. of Facts at ¶¶19, 24).  So the Paks had not observed water

penetration near the collapsed wall since, at the latest, mid-2002.  There were other

areas of the building where leaks were noted, but all of those were fixed such that

no water had been observed six to twelve months prior to the wall collapse (Pl. St.

of Facts at ¶19).

     Even observations by persons other than the insureds do not suggest that the

decay would have been visible to the Paks.  First, we question how anyone can

speculate what was "visible to the insureds" by examining a heap of rubble at the

base of a wall, particularly where no effort was made to ascertain what the wall

looked like prior to the collapse.  But in any event, Robert Faith did not identify

"decay" or deterioration as the cause of the collapse when he observed the wall

after it had collapsed.  In his notes, he identified earth settlement/ movement as the

probable cause (Pl. St. of Facts at ¶14).  Yet Defendants expect the Paks, common

laypersons, to have observed the decay and identified it as the cause of the collapse.

---

[4] Building permits for the roof replacement were pulled by Washington-Dowling
Contractors in October of 2001.  Despite a records subpoena to Washing Dowling,
no records indicated when they finished the job which may have gone into early
2002.

Joshua Carney, who prepared a report for the City of York shortly after the collapse was not able to reach a conclusion as to the cause of the collapse, and did not fully agree with Ms. Huff's report regarding interior water damage or if breaks in mortar, in and of themselves, caused the collapse (Pl. St. of Facts at ¶19).

Even Ms. Huff's February 2009 report, as evidenced by the pictures she relies upon, only reference conditions that became visible as a result of the wall collapse (Pl. St. of Facts at ¶20). Furthermore, her initial report and later report blatantly ignore any suggestion made by any witness or other engineer that the Paks would not have seen the decay.

Finally, Defendants reference a LOSS CONTROL RECOMMENDATION FORM issued just short of a year prior to the collapse. This form actually proves the Paks point about not being aware of any decay in the wall. As explained in paragraph 24 of the Statement of Facts, none of the issues referenced on the form pertain to the wall or anything in the vicinity of the wall and all were corrected by a contractor hired by the Paks. Not even a loss control specialist from an insurance company saw any decay in the wall.

Defendants have completely ignored any of the above, even when they got around, in the course of this litigation, which is far too late in the game, to inquire as to the hidden decay issue. This constitutes bad faith.

3.  Defendants Made no Effort to Conduct Meaningful
    Communications with their Insureds.

The Paks are of Korean descent and are not fully fluent in the English language. Both spoke at their depositions through translators. Mr. Faith even acknowledged that when he attempted to speak to the Paks, they were difficult to understand. No interpreter was procured by Mr. Faith. Further, there is no indication by Ms. Huff in her report that she made any effort to obtain an interpreter (Pl. St. of Facts at ¶¶15, 16).

The finder of fact in this case should be able to determine, based on hearing and observing the Paks, whether the language barrier served as an impediment to Mr. Faith and Ms. Huff's investigation and whether that investigation was not undertaken in good faith where Mr. Faith and Ms. Huff ignored the Paks' input as a result.

4.  Defendants Blindly Relied on a Single Expert Witness.

Bad faith can exist where an insurer blindly relies upon opinions from its own experts despite credible evidence to the contrary. Hollock v. Erie Ins. Exchange, 54 Pa. D&C 4th 449, 508 (Pa. Comm. Pl. 2002), affirmed 842 A.2d 409 (Pa. Super. 2004), appeal dismissed 588 Pa. 231, 903 A.2d 1185 (2006). Relevant to the Court's analysis was not only what the insurer's doctor considered, but also what was not shown to him or ignored by him. For example, Erie's doctor ignored

objective EMG testing results as well as prior medical histories and testimony concerning the mechanism of injury. Erie's doctor furthermore engaged in a "contorted" analysis of other medical diagnoses. Id. at 521, 525. This was held to constitute bad faith, in light of the insurer's utmost responsibility to be objective in its analysis.[5]

The same holds true in this case, as described above. Ms. Huff did not render an opinion as to whether the decay was visible to the Paks since it is obvious that Defendants were not concerned with the issue because they ignored the Paks' purchase of Collapse coverage (Pl. St. of Fact at ¶16). Upon reconsideration, no other investigation regarding the visibility issue was made other than to ask Ms. Huff if the things she observed would have been visible to the Paks, in her opinion (Pl. St. of Facts at ¶18). The subsequent denial of reconsideration is flawed for the same reasons the first investigation was flawed – a failed meaningful investigation. Then, when Ms. Huff rendered her February 2009 report after a factual record, in the course of litigation, had been created, she utterly ignored all testimony and reports that suggested the Paks may have either not known or not appreciated what constituted wall decay wall.

---

[5] Hollock's affirming opinion contains a review of certain legal points, but fully affirmed the findings of fact. 842 A.2d at 417-18. The issues on appeal did not pertain to the points of law cited above.

The record also suggests that Ms. Huff was not an objective inspector from the start. Utilizing an expert without examining her neutrality can constitute bad faith. Hollock at 508. Mr. Faith testified that he typically uses SEA Limited and Ms. Huff for wall collapse cases and that most of those claims are denied (Pl. St. of Facts at ¶16). In fact, Mr. Faith could only identify one instance where a wall collapse claim was covered and that was where wind had blown off a roof (Faith Dep., p. 31, l. 22 – p. 32, l. 6, Ex. C to Defendants' Motion). It appears that Ms. Huff is consistently hired by Mr. Faith and consistently renders opinions in support of denial of claims. The finder of fact should be able to observe Ms. Huff to determine whether she gave an objective opinion in April or whether she was advocating for the Defendants as she does now in this adversarial proceeding.

5.   Defendants Relied Upon (and Continue to Rely Upon) Inapplicable Exclusions.

An unreasonable interpretation or application of a policy's provisions by an insurance company will support a bad faith claim. Corch Const., Inc., 64 Pa. D. & C. 4th at 516-517 (Pa. Comm. Pl., 2003); Hollock 54 Pa. D. & C. 4th at 508.

Defendants, at the initiation of the Paks claim, and even to this time, seek to apply irrelevant and inapplicable exclusions. This constitutes bad faith.

20

First, Defendants seek to apply Exclusions contained in Sections B.2.d., and f. related to wear and tear, corrosion and water intrusion.[6]  But where there is "Collapse," the coverage pertaining to "Collapse" is specified in the policy and implicated.  At Section B.2.k., there is a specific exclusion for collapse:

> k.  Collapse, except as provided below in the Additional Coverages for Collapse.  But if Collapse results in a covered cause of loss at the described premises, we will pay for the loss or damage caused by that covered caused loss (emphasis added).

This is not a situation where the Paks seek coverage for damage to property which, as the result of rust, corrosion or decay, destroyed itself and must be replaced.  Nor is this a case where property was damaged from continuous water penetration of over fourteen days, such as replacement of a floor where a water line slowly leaked and caused warping.  This is an uncontested case of "Collapse," and the coverages for "Collapse" are implicated and limit what is covered.

Otherwise, all Defendants would have to do to avoid coverage for "Collapse" would be to attribute a "Collapse" to wear and tear or decay, or some other exclusion, rendering Section B.2.k. and Section D worthless.  The proper focus regarding issues of coverage under insurance contracts is the reasonable expectation of the insured.  Betz v. Erie Ins. Exchange, 957 A.2d 1244, 1253 (Pa. Super. 2008); Bowersox Truck Sales and Service, Inc. v. Harco Nat. Ins. Co., 209

---

[6] Contrary to Defendants' Motion, Section B.1. has no applicability (Pl. St. of Facts at ¶8).

F.3d 273, 279 (3d Cir. 2000). If there is a Collapse, the insurance coverages

purchased by the Paks pertaining to "Collapse" should be applied.[7]

Even if applied, the record contains sufficient evidence that raises whether

the exclusions are applicable or properly set forth, as explained in Plaintiffs'

Statement of Facts at paragraph 18.

In its motion, Defendants also attempt to apply Exclusions 3.a. and c., in the

Special Form, pertaining to weather conditions and maintenance. The attempted

application of this exclusion is particularly egregious.

The actual language for "Exclusions" under Section B.3. under the policy

reads:

> 3. We will not pay for loss or damage caused by or resulting
> from any of the flowing, 3.a. through 3.c. But if an excluded
> cause of loss that is listed in 3.a. through 3.c. results in a
> Covered Cause of Loss, we will pay for the loss or damage
> caused by that Covered Cause of Loss. (Defendants edited out
> the underlined portion of the above.)

Section D states: "The term Covered Cause of Loss includes the Additional

Coverage – Collapse as described and limited in D.1. through D.5 below." Thus,

even if maintenance or weather issues cause a "Collapse", since Collapse is a

Covered Cause of Loss, it is still covered under the policy and paid if the decay is

hidden from view.

---

[7] This seems to have been recognized by Defendants' broker when they considered
the Paks' counsel's request for reconsideration of denial (see above at p. 13).

Finally, Section C, cited by Defendants, is not applicable for reasons explained in paragraph 8 of our Statement of Facts. The edited out portions of the exclusion clearly permit coverage if a Covered Cause of Loss causes the damage.

The application of these exclusions, in the face of clear policy language to the contrary, is bad faith. Taken together, the above facts indicate that the Paks' claim was unreasonably denied, and Defendants recklessly disregarded the lack of a reasonable basis.

**B.      The Record Contains Evidence To Support Plaintiffs' Claim That Defendants Violated Their Coverage Responsibilities As To The Wall Collapse At The Paks.**

Generally, the initial inquiry in a case of this nature is coverage. If coverage is found, the inquiry then focuses on whether the denial was in bad faith, as defined above. Defendants assert their arguments in reverse order in this motion.

We assert that the above arguments rise to the level of bad faith, but, if the Court does not agree, the arguments, at the very least, raise factual issues as to whether the Paks' claim warrants coverage under the insurance policy, pursuant to an analysis under a breach of contract theory and the less demanding burden of proof. The following are elements of a breach of contract case. (1) the existence of a contract; (2) a breach of a duty imposed by the contract; and (3) damages. Rock-Epstein v. Allstate Ins. Co., 2008 WL 4425059, *2 (E.D. Pa.) (Court finds

23

factual issue as to coverage issue, but dismissed bad faith claim).  There does not appear to be any dispute about the existence of a contract, but only whether facts of the case warrant coverage.

In particular, at the very least, a factual issue exists in this case as to whether decay was visible to the Paks.

Furthermore, the exclusions to coverage, as described above, are not applicable, or, at the very least, there are factual issues pertaining to their applicability.

Thus, even if not rising to the level of bad faith, there are factual issues as to coverage under the insurance policy that precludes Defendants' Motion for Summary Judgment as to Count I of Plaintiff's Complaint or Defendants' Counterclaim.

## IV.   **CONCLUSION**

For the reasons stated above and in our response to statement of facts submitted herewith, including all attached exhibits, Defendants' Motion for Summary Judgment should be denied.

Date:  March 30, 2009

**GOLDBERG KATZMAN, P.C.**
/S/Steven E. Grubb, Esquire
Steven E. Grubb, Esquire (I.D. #75897)
320 Market Street, P.O. Box 1268
Harrisburg, PA 17108-1268
Telephone: (717) 234-4161
*Attorneys for Plaintiffs*

24

## **CERTIFICATE OF SERVICE**

And now, this 30th day of March, 2009 I hereby certify that on this date a

true and correct copy of the foregoing document was served via electronic mail to

the following party:

> George T. McCool, Jr., Esq.
> Wright & O'Donnell, P.C.
> 15 East Ridge Pike, Ste. 570
> Conshohocken, PA  19428

> GOLDBERG KATZMAN, P.C.

> /S/Steven E. Grubb, Esquire
> Steven E. Grubb, Esquire

172476.1