IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **YOUNG SOOK PAK and**<br>**IN SUK PAK t/d/b/a PAK'S FOOD**<br>**MARKET and BIG MOUNT**<br>**LAUNDROMAT and JOE'S**<br>**GROCERY STORE,** | : <br> : <br> : <br> : <br> : | **CIVIL NO. 1:08-CV-0824** |
| **Plaintiffs** | : <br> : | |
| **v.** | : <br> : | **Judge Sylvia H. Rambo** |
| **ALEA LONDON LIMITED and**<br>**SIRIUS INTERNATIONAL**<br>**INSURANCE CORP.,** | : <br> : <br> : <br> : | |
| **Defendants** | : | |

## M E M O R A N D U M

This case involves an insurance contract between Plaintiffs Young Sook Pak and In Suk Pak (hereinafter collectively "the Paks") and Defendants ALEA London Limited ("ALEA") and Sirius International Insurance Corporation ("Sirius"). Before the court is Defendants' motion for summary judgment. (Doc. 14.)

## I.     Background

### A.     Facts

The following facts are undisputed except where noted.

#### 1. Parties

The Paks are husband and wife who operate various businesses, including Joe's Grocery Store located at 360 S. Queen Street, York, Pennsylvania. (Doc. 14-2, Defs.' Stat. of Mat. Facts, ¶ 4; Doc. 21, Pls.' Response to Stat. of Mat. Facts, ¶ 4.) The Paks purchased commercial property insurance from All Risks

Limited ("All Risks"), an authorized agent of Defendants. Defendants jointly issued a Certificate of Insurance with 50% issued by ALEA and 50% issued by Sirius. Coverage under this policy was for all of the Paks' businesses including Joe's Grocery Store. (Defs.' Stat. of Mat. Facts ¶¶ 5, 11; Pls.' Response to Stat. of Mat. Facts ¶¶ 5, 11.) The policy was in effect from May 3, 2005 through May 3, 2006.[1] (*Id.*)

## 2. The Wall Collapse and Maintenance

On April 8, 2006, the north wall of Joe's Grocery Store partially collapsed. Prior to collapse, the wall was covered in vines and other vegetation. (Doc. 17-14, Young Sook Pak Dep. 39-40; Doc. 17-15, In Suk Pak Dep. 22-23.) The parties dispute whether deterioration or decay was visible on the wall prior to its collapse. The Paks state that no deterioration was evident to them, and that they took preventative steps to maintain the entire building. Specifically, in 2001-2002, the Paks had the roof replaced because of water leakage. (Doc. 21-3, Paks' Aff. ¶ 3.) Following the roof replacement, there continued to be a water leakage problem that was ultimately resolved by the roofing contractor, and there were no visible signs of any moisture penetration into any part of the building for at least six months prior to the wall's collapse. (*Id.* ¶¶ 5-6.) According to the Paks, the last sign of moisture penetration was in the area opposite the collapsed wall. (Paks' Aff. ¶¶ 7-9.) The Paks state that any time they became aware of maintenance issues, they made repairs. For instance, they received a notice from their prior insurer, Donegal

---

[1] Throughout this memorandum the court will refer to the insurance issued by Defendants as a single policy. The court acknowledges that the Certificate of Insurance contained coverage under various forms, endorsements, and other restrictions. However, for the sake of clarity the court will refer to the insurance issued by Defendants in the singular.

Insurance, listing certain items in need of repair. (Paks' Aff., Ex. B, Loss Control Dep't. Recommendation Form from Donegal Insurance.) Among the items listed were: (1) a rotting window on the rear third floor of the main section; (2) a balcony along the left side of the building that needed to be inspected for rotted wood, repaired, and painted; (3) the cantilever roof on the first floor near the balcony needed to be secured to or removed from the building, (4) loose bricks along the left side of the building above the basement window needed to be repaired, and (5) the source of water in the basement and water damage in the store needed to be identified and repaired. (*Id.*) None of these deficiencies was near the collapsed wall, and, according to Plaintiffs, all of them were remedied to the satisfaction of Donegal Insurance. (Paks' Aff. ¶¶ 14-19.) Donegal Insurance also required the Paks to remove vegetation from around the property, but not the vines growing on or near the wall that collapsed. (*Id.* ¶ 20.) Prior to the wall's collapse, no one, including Donegal Insurance, alerted the Paks to any decay or deterioration of the wall, or that the wall needed to be repaired or maintained. (*Id.* ¶ 23; Young Sook Pak Dep. 37; In Suk Pak Dep. 12, 21.)

   Defendants assert that the deterioration was visible to the Paks prior to the wall's collapse. Specifically, they state that the undisturbed brickwork of the north wall was visibly weathered, deteriorated, and discolored from excessive moss and algae growth. (Doc. 17-11, Feb. 16, 2009 Report by Kelly Huff, at 10.) In some areas of the remaining wall, the mortar was cracked and disintegrated, while in other areas there was no mortar at all (*Id.*) A large amount of vegetation was growing on the wall, some of which was well entrenched into the exterior face of the brick. (*Id.* at 10.) In her report, Kelly Huff stated that during her investigation of the premises,

water staining was apparent on a ceiling tile near the collapsed wall, and on the interior face of the north wall. (*Id.* at 26.) Furthermore, Huff's report states that "exposed wood framing was weathered and the siding was dilapidated and hanging off of the north wall." (*Id.*) According to Defendants, all of these conditions were visible prior to the wall's collapse, and should have put the Paks on notice that the wall needed to be repaired.

### 3. The Investigation

After the wall collapsed, the Paks submitted a claim through All Risks who then assigned the claim to its adjuster Johns Eastern Company. Johns Eastern assigned the claim to one of its employees, Robert Faith, to conduct an investigation. Throughout the course of the investigation, Johns Eastern and Faith communicated only through Susan Eich, an employee of All Risks, and never communicated with anyone from ALEA or Sirius.[2] (Doc. 17-8, Robert Faith Dep. at 12.) Faith received the referral from All Risks on April 11, 2006 and called the Paks that same day. (*Id.* at 36.) Faith noted immediately that it was difficult to communicate with the Paks because they do not speak English very well. (*Id.*) No one representing Defendants ever attempted to get a Korean interpreter to speak to the Paks about the incident, all conversations between any of Defendants representatives and the Paks were in English. (Faith Dep. 40.) Faith went to the site of the wall collapse on April 11, 2006. (*Id.*) Faith's initial impression was that the wall collapse was caused by "[p]ossibl[e] settlement, earth movement." (Faith Dep.,

---

[2]It appears that there were at least 2 layers of individuals between the Robert Faith and the Defendants in this case. Faith dealt exclusively with Susan Eich at All Risks. (Faith Dep. at 12.) Susan Eich also had no direct communication with Defendants, but rather communicated exclusively with Defendants' London-based brokers, CBB. (Doc. 21-4, Susan Eich Dep. at 13.)

Ex. 1, case notes.)  Faith does not remember what he talked about with the Paks during his initial visit to the site, and does not know whether he asked them any questions about any maintenance that they performed on the wall or the property in general.  (Faith Dep. at 41.)  Because he could not diagnose the cause of the collapse himself, Faith requested permission from All Risks to hire an engineer to provide an opinion.  (Faith Dep. at 39.)

After receiving permission to do so, Faith hired SEA Limited, an engineering firm located in Maryland, to provide expert engineering services.  SEA assigned the job to Kelly Huff, a professional engineer.  (*Id.* at 46.)  Faith testified at his deposition that he adjusts 4-6 wall collapse claims per year, and that he hires an engineer for all of these claims.  (*Id.* at 19).  SEA is the engineering firm that Faith typically uses for wall collapse claims, and the only engineer ever sent by SEA is Kelly Huff.  (*Id.* at 47.)  On or about April 17, 2006, Huff visited the wall collapse site; Huff's opinion was that the wall collapsed because of a lack of maintenance and continuous water seepage, which caused the deterioration of the wood framing, and the brick and mortar joints.  (Doc. 17-7, May 22, 2006 Ltr. from Robert Faith to the Paks, at 3.)  The parties disagree whether Huff spoke to the Paks about the condition of the wall prior to its collapse.  Huff states in her report that Young Pak was interviewed regarding the history of the building and the reported damage.  (Doc. 17-6, Apr. 20, 2006, Huff Report, at 1.)  The Paks acknowledge speaking to Huff, but deny that she inquired about what was visible to them prior to the collapse and/or their maintenance history for the building.  (Paks' Aff. ¶ 24.)  Based solely on the report of Huff, Faith recommended to All Risks that the claim be denied; and on May 22, 2006 Faith sent the Paks a denial letter.  (Faith Dep. 43; 58.)

## 4. **Terms of the Insurance Policy**

The terms of the insurance policy include various exclusions listed on a form titled "Causes of Loss – Special Form (CP 10 30 04 02)" (hereinafter "Causes of Loss form"). (*See* Doc. 21-2.) The exclusions listed in section B of that form are the crux of the dispute between the parties.[3] In particular, Section B.2 lists 13 specific exclusions, and subsets of those exclusions, only three of which are relevant here: B.2.d.1-4; B.2.f; and B.2.k. Those sections state:

B. **Exclusions**

. . .

2. We will not pay for loss or damage caused by or resulting from any of the following:

. . .

d. (1) Wear and Tear;
(2) Rust or other corrosion, decay, deterioration, hidden or latent defects or any quality in property that causes it to damage or destroy itself;
(3) Smog;
(4) Settling, cracking, shrinking, or expansion

. . .

f. Continuous water seepage or leakage of water, or the presence or condensation of humidity, moisture

---

[3]Defendants spend considerable time in their brief discussing section B.1. Section B.1 states: "We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss." (Doc. 21-2, § B.1.) This introductory language is followed by eight specific exclusions not at issue in this case. Section B.2 states: "We will not pay for loss of damage caused by or resulting from any of the following" (*Id.* at § B.2.) Conspicuously absent from this section is the modifying language contained in section B.1 stating that "[s]uch loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss." (*Id.* at § B.1.) It is unclear from Defendants brief why they spent so much time discussing the B.1 language related to concurrent causes of loss when that language is not contained in section B.2., and all of the stated bases for their denial of coverage are contained in section B.2 . The court will not read this additional condition into section B.2, and assumes that the parties intended for there to be stricter standards for B.1 exclusions than B.2 exclusions.

or vapor, that occurs over a period of 14 days or more.

. . .

k. Collapse, except as provided below in the Additional Coverage for Collapse. But if collapse results in a Covered Cause of Loss at the described premises, we will pay for the damage cause by the Covered Cause of Loss.

(Doc. 21-2 §§ B.2.d.1-4; B.2.f; and B.2.k.) The insurance policy includes exceptions to these exclusions in the case of collapse. These exceptions are gathered under section D of the contract titled Additional Coverage - Collapse. That section reads, in relevant part:

**D. Additional Coverage - Collapse**

The term Covered Cause of Loss includes the Additional Coverage - Collapse as described and limited in **D.1.** through **D.5,** below.

1. With respect to buildings:

a. Collapse means an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its intended purpose;

. . .

2. We will pay for direct physical loss or damage to Covered Property, caused by collapse of a building or any part of a building that is insured under this Coverage Form or that contains Covered Property insured under this Coverage Form, if the collapse is caused by one or more of the following:

. . .

b. Decay that is hidden from view, unless the presence of such decay is known to an insured prior to collapse;

7

(Doc. 21-2 §§ D.1.a; D.2.b.)

### 5. <u>The Denial</u>

On May 22, 2006, Faith sent a letter to the Paks officially denying the claim. (Doc. 17-7, May 22, 2006 Denial Ltr.) Faith's May 22, 2006 letter listed the grounds for denial as section B.2.d.1-4 and B.2.f. (*Id.*) Faith erroneously stated in the denial letter that "Collapse is not a named peril, which is not covered under CP1030 (4/02) named peril policy." (*Id.*) Faith relied exclusively on the opinion of Kelly Huff in reaching the decision to recommend denial. (Faith Dep. 43; 58.)

In response to this letter, the Paks hired an attorney —Glen Smith, Esquire— to request reconsideration of the denial. On December 12, 2006, Attorney Smith wrote Faith requesting reconsideration based on the Paks' belief that the claim had been incorrectly categorized under sections B.2.d. and B.2.f. The Paks assert that coverage exists on basis of the provisions in D.2.b because the decay leading to the collapse was hidden from view, and it was not known to them at the time of the collapse. (Doc. 21-10, Dec. 12, 2006 Ltr. from Glenn Smith to Robert Faith.)

In response, on January 18, 2007, Faith wrote back to Attorney Smith and denied the Paks' request for reconsideration stating that "[d]ue to the fact that algae and vegetation were growing on the outside of the building and broken mortar joints were highly visible on the exterior wall that collapsed . . . [ALEA] and [Sirius] are maintaining the denial of the claim and letter originally sent to [the Paks] on May 22, 2006. (Doc. 17-7 at 6.) It is undisputed that Faith did not conduct additional investigation into what the Paks did or did not know about the deterioration of the wall; rather, he simply asked Kelly Huff whether the deterioration that she

concluded caused the collapse would have been visible to the Paks prior to the collapse. (Faith Dep. 63.)

### 6. **The City of York**

In addition to the investigation conducted by Defendants, following the wall collapse, the City of York hired its own engineer to assess the continued habitability of Joe's Grocery Store. On April 10, 2006—one day before Faith observed the site and seven days before Huff observed the site—professional engineer Joshua Carney performed an inspection for the City. (Doc. 17-12, Joshua Carney Dep. at 8.) After examining the site, Carney concluded:

> The collapse appears to be the result of a combination of several factors, and the precipitating event is not known at this time. The framing was somewhat deteriorated, but did appear to be supported on the wall immediately prior to the collapse. There do not appear to have been any ties between the masonry wall and the floor joists beyond the pocketing of the joists in the wall. This is common in the buildings of this age and type of construction. Finally, there did appear to be some moisture damage in the outer wythe of the brick wall, but the inner wythe appeared to be in fairly good condition.

(Doc. 17-10, Apr. 10, 2006 Ltr. from Joshua Carney to City of York at 1.) In his deposition, Carney testified that the collapsed wall showed "some moisture damage in the outer part of the wall, but it didn't extend the whole way through the wall. In other words, it wasn't a brick masonry wall that was completely in poor condition." (Carney Dep. at 14.) Carney testified that the bulk of the deterioration that he saw was on the outside face of the wall, not the inside face of the wall and that the cause of the collapse was related to exterior deterioration. (*Id.* at 28.) Carney testified that the vegetation growing on the outside of the wall would not have caused the wall deterioration, but may have exacerbated it by slowing the rate at which the wall dries out after a rain fall, and by pulling at the mortar. (*Id.* at 31)

### 7. **Plaintiffs' expert**

After litigation commenced, Plaintiffs hired an expert engineer—David E. Aufiero— to offer an opinion about the cause of the wall collapse. Aufiero agreed with the ultimate conclusion of Ms. Huff that the wall collapse was likely due to the long-term deterioration of the brick, mortar, and brick support framing of the wall. (Doc. 17-9, Report of David Aufiero, at 3.) Aufiero disagreed with Huff's assessment that much of the deterioration was visible before the collapse. In his report, Aufiero stated:

> It is a further opinion that interior finishes and advanced ivy growth on the exterior face of the wall obstructed the ability to fully observe and evaluate the condition of the wall prior to the collapse. The writer is of the opinion that much of the deterioration and decay noted in the reviewed reports became evident/exposed after the collapse of the subject wall. The writer is of the opinion that evidence of varying deterioration to the exterior mortar joints is not necessarily an indication of a pending wall collapse. It is a further opinion that evidence of a pending collapse could not be readily ascertained by a layperson viewing the subject wall.

(Aufiero Report at 3.)

### B. **Background**

On April 7, 2008, Plaintiffs filed their complaint against Defendants in the York County Court of Common Pleas. In their complaint, Plaintiffs asserted two counts: Count I is a breach of contract claim; and, Count II is an insurance bad faith claim pursuant to 42 Pa. Cons. Stat. Ann. § 8371. On May 7, 2008, Defendants filed a Notice of Removal with this court invoking the court's jurisdiction pursuant to 28 U.S.C. § 1332(a)(1). (Doc. 1.) Defendants filed their Answer to the Complaint and counterclaim for declaratory relief on May 12, 2008. (Doc. 2.) Plaintiffs filed their answer to Defendants' counterclaim on May 30, 2008. (Doc. 6.) After discovery,

Defendants filed the instant motion for summary judgment on March 12, 2009, (Doc. 14), and its brief in support and statement of material facts on March 13, 2009. (Docs. 15-16.) On March 30, 2009, Plaintiffs filed their brief in opposition to Defendants' motion for summary judgment, their answer to Defendants' statement of material facts, and supporting exhibits. (Docs. 21-22.) Pursuant to Local Rule 7.7, Defendants' reply brief was due by April 16, 2009; no reply brief was filed. Defendants' motion is ripe for disposition.

## II.     **Legal Standard**

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *accord Saldana v. Kmart Corp.*, 260 F.3d 228, 231-32 (3d Cir. 2001). A factual dispute is "material" if it might affect the outcome of the suit under the applicable law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is "genuine" only if there is a sufficient evidentiary basis that would allow a reasonable fact-finder to return a verdict for the non-moving party. *Id.* at 248. The court must resolve all doubts as to the existence of a genuine issue of material fact in favor of the non-moving party. *Saldana*, 260 F.3d at 232; *see also Reeder v. Sybron Transition Corp.*, 142 F.R.D. 607, 609 (M.D. Pa. 1992).

Once the moving party has shown that there is an absence of evidence to support the claims of the non-moving party, the non-moving party may not simply sit back and rest on the allegations in its complaint. *See Celotex Corp. v. Catrett*,

477 U.S. 317, 324 (1986). Instead, it must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* (internal quotations omitted); *see also Saldana*, 260 F.3d at 232 (citations omitted). Summary judgment should be granted where a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial." *Celotex*, 477 U.S. at 322-23. "'Such affirmative evidence – regardless of whether it is direct or circumstantial – must amount to more than a scintilla, but may amount to less (in the evaluation of the court) than a preponderance.'" *Saldana*, 260 F.3d at 232 (quoting *Williams v. Borough of West Chester*, 891 F.2d 458, 460-61 (3d Cir. 1989)).

## III.      Discussion

In their motion, Defendants seek summary judgment on both of Plaintiffs' claims. As to Count I, Defendants assert that the undisputed facts demonstrate that the April 8, 2006 wall collapse was caused by decay, deterioration, and water penetration "all or some of which was visible to the Plaintiffs prior to the collapse." (Doc. 14-3, Defs.' Br. in Supp. of Mot. for Sum. J. at 10.) Defendants contend, as to Count II, that Plaintiff has failed to adduce clear and convincing evidence that Defendants lacked a reasonable basis for their denial of Plaintiffs' claims. The court will address each of these in turn.

### A.      Breach of Contract

Because the court's subject matter jurisdiction is based on diversity of citizenship, the court must look to the substantive law of Pennsylvania to determine

the rights and obligations of the parties. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 77 (1938). In Pennsylvania, to state a cause of action for breach of contract, the Paks must demonstrate that (1) a valid contract exists, (2) Defendants breached a duty imposed by the contract, and (3) that damages resulted. *See Williams v. Nationwide Mut. Ins. Co.,* 750 A.2d 881, 884 (Pa. Super. Ct. 2000). The parties do not dispute the existence of a contract or, that if coverage exists, Plaintiffs' suffered damages; however, they vigorously dispute whether a breach occurred.

It is well settled that, in an insurance coverage case, the insured bears the burden of proving that the damages claimed fall within the scope of coverage accorded by the policy. *See Koppers Co. v. Aetna Cas. & Sur. Co.*, 98 F.3d 1440,1446 (3d Cir.1996). The parties appear to agree that property damage is a covered loss afforded by the policy, as the Defendants now concede that collapse is a covered loss under the policy. (Doc. 17-7, Jan. 18, 2007 Denial of Recons. Ltr.)

Once this initial burden is met, the burden then shifts to the insurer to prove that an exclusion from coverage applies, such that the damages claimed are not covered. *See Northern Ins. Co. v. Aardvark Assocs.*, 942 F.2d 189, 194 (3d Cir.1991). Here, Defendants argue that since the cause of the damages was the collapse of the northern wall of the building, coverage is excluded under §B.2.d., f., and k of the agreement. Those sections state, in relevant part:

> B.2. We will not pay for loss or damage caused by or resulting from any of the following:
>
> . . .
>
> d. (1) Wear and Tear;
> (2) Rust or other corrosion, decay, deterioration, hidden or latent defect or any quality in property that causes it to damage or destroy itself;

. . .

    f.  Continuous or repeated seepage or leakage of water, or the presence or condensation of humidity, moisture or vapor, that occurs over a period of 14 days or more.

. . .

    k.  Collapse, except as provided below in the Additional Coverage for Collapse.  But if collapse results in a Covered Cause of Loss at the described premises, we will pay for the loss or damage caused by that Covered Cause of Loss.

(Doc. 21-2 §§ B.2.d., f. and k.)  Plaintiffs do not contest that the contract contains these exclusions; however, they argue that they are inapplicable because of the exception to the exclusions provided in the Additional Coverage for Collapse, section D.2.b. of the insurance policy, which Plaintiffs contend overrides section B.2.d., f., and k.  Section D.2.b. reads:

### D. Additional Coverage – Collapse

. . .

    2.  We will pay for direct physical loss or damage to Covered Property, cause by Collapse of a building or any part of a building that is insured under this Coverage Form or that contains Covered Property insured under this Coverage Form, if the collapse is cause by one of more of the following:

. . .

    b.  Decay that is hidden from view, unless the presence of such decay is known to the insured prior to collapse.

(Doc. 21-2 §§ B.2.d, k and D.2.b.)

    If it is shown that an exclusion applies, the insured then bears the burden of proving that an exception to the exclusion is applicable, such that the damages

claimed are covered notwithstanding the exclusion. *See, e.g., TIG Specialty Ins. Co. v. Koken*, 855 A.2d 900, 915 (Pa. Commw. Ct. 2004) (construing a directors' and officers' liability insurance policy and holding that as the insurer "met its burden in establishing the applicability of the exclusion, the [insureds] bear the burden of establishing the applicability of any exception to this exclusion"); *Air Products & Chemicals, Inc. v. Hartford Accident & Indemnity Co.*, 25 F.3d 177,180 (3d Cir.1994) (noting, in a case concerning a general liability insurance policy, that the insured bears the burden of proving the applicability of an exception to an exclusion)  Thus, in the case at bar, Plaintiffs bear the burden of demonstrating that the exception contained in D.2.b. for collapse coverage applies.  Plaintiffs assert that this provision overrides the general exclusion for decay contained in B.2.d, and the exclusions contained in section B.2.f., because a plain reading of section D.2.b. shows that if a collapse is caused by decay hidden from view and unknown to the insured prior to the collapse, the collapse is a covered event notwithstanding the exclusions listed in section B.2.

Defendants do not appear to contest this reading of the agreement, instead they argue that Plaintiffs have failed to meet their burden of coming forward with sufficient evidence to support their position that the decay of the wall was hidden from view.  Specifically, Defendants argue it is undisputed that the April 8, 2006 wall collapse was caused by decay, deterioration, and water penetration of the insured property, all or some of which was visible to Plaintiffs prior to the collapse. Defendants cite sections of Plaintiffs' depositions where Plaintiffs admit that they performed no maintenance on the wall in question during the 18 years that they owned it.  (Young Sook Pak Dep. at 26; In Suk Pak Dep. at 10.)  Additionally, both

Plaintiffs admitted that, prior to April 8, 2006, they had not made any inspections of the conditions of the wall. (Young Sook Pak Dep. at 40; In Suk Pak Dep. at 24.) Defendants further argue that it is clear from the photos taken of the wall post-collapse that the wall was in poor condition and showed significant signs of a lack of maintenance. Finally, Defendants point to the expert reports of Kelly Huff, as well as the loss control recommendation form from the Paks' prior insurance company, to corroborate their position that the decay in the north wall was or should have been evident to the Paks prior to the wall's collapse.

Plaintiffs do not dispute that they did not perform maintenance on the wall or that they did not regularly check on the condition of the wall prior to its collapse. Instead, the Paks state that when they did check on the wall, they did not observe any decay. The outside of the wall was obscured by vegetation, and the inside showed no visible signs of distress. (In Suk Pak Dep. at 33-35; Young Sook Pak Dep. at 39-40.) Furthermore, the Paks argue that even if the decay had been visible, it would not have been apparent to them that the wall was in need of repair because, as laypersons, they would not know what to look for. This position is supported by Plaintiffs' expert, David Aufiero, in his report. (Doc. 17-9, Aufiero Report at 4.) The Paks also argue that they performed preventative maintenance when it was necessary. For instance, they replaced the roof in 2001-2002 when it showed signs of leaking, and they promptly fixed the water leakage the occurred after the roof was repaired. (Paks' Aff. ¶ 4-5.) It is undisputed that there were no signs of water penetration for least six months prior to the wall collapse, and that there were never any signs of water penetration at or near the wall. (*Id.* ¶¶ 6-7.)

Thus, the crux of the argument by the parties concerns what was known to the Paks prior to the wall's collapse. Defendants' position is that the decay was so obvious that the Paks claim that it was hidden from view is incredible. The court disagrees. The term "decay hidden from view" as used in section D.2.b of the insurance contract is undefined. In such a case, "[w]ords of 'common usage' in an insurance policy are to be construed in their natural, plain, and ordinary sense, and a court may inform its understanding of these terms by considering their dictionary definitions." *Wall Rose Mut. Ins. Co. v. Manross*, 939 A.2d 958, 962 (Pa. Super. Ct. 2007). The parties have not pointed to case law interpreting this phrase, and the court has not found any on its own; however, case law regarding an analogous phrase "hidden decay" is illustrative. Courts construing the term "hidden decay" have interpreted it to mean decay that is "not visible," "out of sight or off the beaten track; concealed," "out of sight," or "concealed." *See Wurst v. State Farm Fire & Cas. Co.*, 431 F. Supp. 2d 501, 505 n. 7 (D.N.J. 2006). Thus, the Paks must prove that the collapse was caused by decay and that the decay was "not visible" or "concealed." *See The Sandalwood Condominium Ass'n at Wildwood, Inc. v. Allstate Ins. Co.*, 294 F. Supp. 2d 1315, 1319 (M.D. Fla. 2003).

It is not enough for the Paks to simply assert that he was unaware of the decay. *See S.R.P. Management Corp. v. Seneca Ins. Co.*, 06-935, 2008 WL 2039466 *8 (E.D. Pa. May 13, 2008). The test is objective—that reasonable insured under such circumstances would have seen or otherwise been aware of the decay. *Id.* "While an insured need not affirmatively inspect the insured premises so as to uncover otherwise hidden decay and repair it before it worsens, he likewise cannot

retreat to willful blindness or refusal to draw those conclusions a reasonable insured would draw from visible signs of deterioration or decay." *Id.* (citations omitted).

The record before the court reflects that there is a genuine issue of material fact concerning whether the decay and deterioration of the wall was hidden from view. In addition to the Paks' statements that they did not see the wall's deterioration, the report of Plaintiff's expert David Aufiero supports their conclusion that even if they had seen the deterioration, it would not have lead them to conclude that the wall was in imminent danger of collapse. In his report, Aufiero states "[i]t is a further opinion that evidence of a pending collapse could not be readily ascertained by a layperson viewing the . . . wall." (Aufiero Rep. at 4.)

To defeat summary judgment, Plaintiffs must come forward with some evidence that there is a genuine issue of material fact for trial. Plaintiffs' testimony that they did not see the deterioration, and their expert's testimony that, even if they had, they would not have automatically known the nature and extent of the decay meets this burden. Because coverage under the insurance contract turns on whether or not the decay to the wall was hidden from view, and because there is a genuine issue of material fact about whether it was hidden, the court will deny Defendants' motion for summary judgment as to Plaintiffs' breach of contract claim.

### B.     Bad Faith under 42 Pa. Cons. Stat. Ann. § 8371

Defendants contend that even if Plaintiffs survive summary judgment on their breach of contract claim, they have adduced insufficient evidence to sustain their insurance bad faith claim. Specifically, Defendants argue that Plaintiffs cannot show by clear and convincing evidence that Defendants lacked a reasonable basis for their denial of Plaintiffs' claim. Plaintiffs argue that there are several genuine

issues of material fact for trial. Specifically, they argue that (1) Defendants conducted an investigation without consideration of the coverage of the insurance policy; (2) they failed to conduct a meaningful investigation regarding whether decay was visible to Plaintiffs; (3) they made no effort to meaningfully communicate with Plaintiffs; and (4) Defendants blindly relied on a single expert witness. For the reasons the follow, the court finds that there are genuine issues of material fact concerning Plaintiffs' bad faith insurance claim that cannot be resolved on summary judgment, therefore, the court will deny Defendants' motion.

       To prevail on a claim under Pennsylvania's insurance bad faith statute, 42 Pa. Cons. Stat. Ann. § 8371, Plaintiffs must demonstrate by clear and convincing evidence that (1) Defendants did not have a reasonable basis for denying coverage under the policy; and (2) that Defendants knew or recklessly disregarded its lack of reasonable basis in denying the claim. *Terletsky v. Prudential Property and Cas. Ins. Co.,* 649 A.2d 680, 688 (Pa. Super. Ct. 1994)(citations omitted); *see also Klinger v. State Farm Auto Ins. Co.*, 115 F.3d 230, 233-34 (3d Cir. 1997)(clarifying that the test set forth in *Terletsky* does not require any motive of self-interest or ill will, but instead requires plaintiffs to demonstrate only that the insurer had no reasonable basis for denying claims under the policy and knew or recklessly disregarded its lack of reasonable basis for denying the claim) In Pennsylvania, bad faith can exist when an insurance company fails to conduct a meaningful investigation of a claim, or where the insurer's evaluation is less than honest, intelligent and objective. *See Bacciale v. Nationwide Ins. Co.*, 92-7190, 1993 WL 323594 * 9 (E.D. Pa. 1993) (citing *Puritan Ins. Co. v. Canadian Universal Ins. Co. Ltd.*, 775 F.2d 76 (3d Cir 1985)). Since Plaintiffs must meet the clear and

convincing evidence standard in their case at trial, the court must evaluate the parties evidence with the clear and convincing evidence standard in mind. *See Anderson*, 477 U.S. at 255 ("[T]he determination of whether a factual dispute requires submission to a jury must be guided by the substantive evidentiary standards that apply to that case.").

Defendants argue that they acted reasonably in investigating Plaintiffs' claims because they retained an independent adjustment firm—Johns Eastern Company—there were site inspections done by that firm, an engineer was retained, they timely made a decision, albeit a denial, and that they reconsidered the evidence at Plaintiffs' request. (Doc. 14-3, Br. in Supp. of Mot. for Sum. J. at 9.) Plaintiffs dispute Defendants handling of the claim. Plaintiffs argue that Defendants ignored the coverages applicable to the Paks. It is apparent from the records that they did. It is undisputed that Defendants' initial denial letter stated that the Paks did not have collapse coverage, and, it appears that they did not analyze coverage under the Section D of the contract. (Doc. 17-7, May 22, 2006 Denial Ltr. at 3.) Instead, Defendants based their denial on exclusions from coverage provided in Section B.2.d and f, related to wear and tear, corrosion, and water intrusion. Plaintiffs argue that this in and of itself is an indicia of bad faith that impacted the scope of Defendants' investigation. Furthermore, the Paks argue that Defendants reliance on inapplicable exclusions meant that they never conducted the most important inquiry: whether any decay was visible and known to the Paks prior to the collapse.

Defendants contend that they did discuss with the Paks what they knew or did not know about the condition of the wall prior to collapse. Specifically, Defendants point to Kelly Huff's report where she states that she spoke with "Mrs.

Young Pak . . . regarding the reported damage and the history of the building."
(Doc. 17-11, Feb. 16, 2009, Report of Kelly Huff at 5.)  The Paks dispute that they
had any conversations with Kelly Huff or Robert Faith about their maintenance
history of the collapsed wall or whether they observed any decay in the wall prior to
collapse.  (Doc. 21-3, Paks' Aff. ¶ 24.)    Plaintiffs also point out that Kelly Huff's
initial report did not opine as to what was visible to the Paks prior to the wall's
collapse.  (*See* Doc. 17-6, Apr. 20, 2006 Report of Kelly Huff.)  According to
Plaintiffs, this is evidence of Defendants' persistent determination to deny coverage
without fully considering the scope of available coverage, and that their reliance on
inapplicable exclusions constitutes bad faith.

Plaintiffs also argue that even when they requested reconsideration and
pointed out that collapse coverage was present, Defendants took no steps to
reasonably investigate what was or was not visible to the Paks prior to collapse.
Plaintiff's point to Robert Faith's deposition where he stated that other than talking
to Kelly Huff about what she believed was visible to the Paks prior to the wall
collapse that he did no further investigation.  (Faith Dep. at 63.)  Finally, Plaintiffs
argue that Defendants reliance only on the opinion of Kelly Huff despite the
availability of potentially contradictory evidence from the Joshua Carney, the
engineer hired by the City of York, demonstrates that Defendants acted in bad faith
and did not accord the interest of the Paks the same faithful consideration that they
gave to their own interests.

From the records before it, the court concludes that a reasonable jury
could decide, on the basis of clear and convincing evidence, that Defendants acted
in bad faith by (1) applying the wrong sections of the insurance contract, and (2)

failing to conduct a meaningful investigation regarding whether the decay of the collapsed wall was visible to the Paks prior to the collapse. This is not to say that Plaintiffs will prevail on their bad faith claim at trial, only that they have adduced evidence such that a reasonable jury could rule in their favor. Thus, the court will deny Defendants' motion for summary judgment.

**IV.** **Conclusion**

For the reasons stated above, the court will deny Defendants' motion for summary judgment, (Doc. 14), and will issue an order consistent with this memorandum.

s/Sylvia H. Rambo
United States District Judge

Dated: July 30, 2009.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

**YOUNG SOOK PAK and**
**IN SUK PAK t/d/b/a PAK'S FOOD**
**MARKET and BIG MOUNT**
**LAUNDROMAT and JOE'S**
**GROCERY STORE,**

      **Plaintiffs**

      **v.**

**ALEA LONDON LIMITED and**
**SIRIUS INTERNATIONAL**
**INSURANCE CORP.,**

      **Defendants**

:
:
:    **CIVIL NO. 1:08-CV-0824**
:
:
:
:
:
:    **Judge Sylvia H. Rambo**
:
:
:
:
:

# O R D E R

In accordance with the attached memorandum of law, **IT IS HEREBY**
**ORDERED THAT** Defendants' motion for summary judgment, (Doc. 14), is
**DENIED**. A new scheduling order listing a date for trial, as well as deadline for
pretrial memoranda, and motions *in limine*, will be forthcoming.

                                    s/Sylvia H. Rambo
                                    United States District Judge

Dated: July 30, 2009.